**Opinion issued December 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00265-CV

————————————

**8-PLUS PROPERTIES, LLC, Appellant**

**V.**

**INVESCO COMMERCIAL ENTERPRISES, LLC, Appellee**

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Case No. 2015-39745**

---

## MEMORANDUM OPINION

Appellant, 8-Plus Properties, LLC ("8-Plus"), challenges the trial court's judgment, rendered after a jury trial, in favor of appellee, Invesco Commercial Enterprises, LLC ("Invesco"), in Invesco's suit against 8-Plus for breach of contract and specific performance. In three issues, 8-Plus contends that the evidence is

legally and factually insufficient to support the jury's finding on actual and apparent authority and the trial court erred in awarding specific performance.

We reverse and render.

## Background

In its amended petition, Invesco alleged that on January 19, 2015, it executed a written agreement (the "Contract") with 8-Plus to purchase a property located at 8600 Cullen Boulevard, Houston, Harris County, Texas (the "Property") for $62,500. On February 11, 2015, Invesco and 8-Plus executed an amended version of the Contract, which added an "as is" clause to section 7A. (Internal quotations omitted.)

According to Invesco, it delivered the executed Contract and $1,000 in earnest money to First American Title Company, the escrow agent designated in the Contract. First American Title Company issued a commitment for title insurance, which contained a schedule listing various documents 8-Plus was required to provide at or before closing, including a "Resolution of the Managers" document, the purpose of which was to "confirm who [was] authorized to execute documents on behalf of [8-Plus]." (Internal quotations omitted.) On March 4, 2015, First American Title Company's escrow officer sent an email to 8-Plus requesting the Resolution of Managers document, explaining that it was the only thing the officer needed from 8-Plus before the closing on the Property. The officer further advised

8-Plus that "closing could not be scheduled and a closing statement would not be prepared until the Resolution [of the Managers document] was provided."

As the scheduled closing date approached, Johnny Carroll ("Johnny"), a "managing member" of 8-Plus,[1] advised Invesco and First American Title Company that he was having trouble obtaining the Resolution of the Managers document because "his brother decided he no longer want[ed] to sell" the Property. But Johnny, nevertheless, assured Invesco and First American Title Company that the Resolution of the Managers document was "forthcoming." Ultimately though, 8-Plus never provided the Resolution of the Managers document. After the scheduled closing date had passed, Johnny again assured Invesco that the document was "forthcoming." "Relying upon [Johnny's] promises and representations, [Invesco] allowed [8-Plus] additional time to perform its obligations under the Contract." However, 8-Plus never furnished the Resolution of the Managers document, and thus, the parties were never able to close on the Property with First American Title Company pursuant to the Contract.

On May 29, 2015, Invesco sent an email to 8-Plus demanding performance pursuant to the Contract. 8-Plus did not respond. On June 10, 2015, Invesco sent 8-Plus a written notice of default and a demand for performance. In response to the

---

[1] Invesco alleged that Johnny had actual and apparent authority to act on behalf of 8-Plus.

3

notice and demand, Johnny called Invesco and stated that his family did not wish to sell the Property. Invesco reiterated its demand for 8-Plus to perform pursuant to the Contract, but 8-Plus "repudiated the Contract and refused to perform." On July 2, 2015, Invesco tendered performance of its obligations pursuant to the Contract at First American Title Company, "including but not limited to, payment of the purchase price via wire transfer." However, "[d]espite numerous demands by [Invesco]," 8-Plus "continue[d] to fail and refuse[d] to sell the Property" pursuant to the Contract. Invesco brought a claim against 8-Plus for breach of contract and sought specific performance of the Contract.

8-Plus answered, generally denying the allegations in Invesco's amended petition and specifically denying, among other things, that the enforceability of the Contract was "conditioned upon 8-Plus's [other] member-managers approving the sale" and that 8-Plus's obligations to perform under the Contract were "conditional on a resolution to sell the Property being approved by 8-Plus's member[-]managers." It also asserted various affirmative defenses.

At trial, Abdallah Kamal testified that he, along with two partners, was the owner of Invesco, a real estate company that "provide[d] strategic real estate investments for other business." As an owner of Invesco, Kamal was a member of Invesco, and he reviewed agreements and helped with diligence on matters. According to Kamal, Invesco owned Farmer's Fresh Meat, a "meat market" in

4

southeast Houston. Invesco sought to purchase a lot, i.e., the Property, near the meat market to use as a parking lot. Kamal first learned about the availability of the Property for purchase from one of his partners.

Kamal further testified that Invesco negotiated "heavily" with 8-Plus for the Property, and Invesco offered to pay $62,500 cash for the Property. Kamal believed that 8-Plus accepted Invesco's offer. In January 2015, he received the Contract.[2] In the course of doing his due diligence related to the Contract, Kamal learned that 8-Plus was a "member-managed" limited liability company ("LLC"), and he learned the names of the eight members of 8-Plus.[3] Invesco was also a member-managed LLC, so Kamal was familiar with that form of management. Kamal noted that after reviewing the Contract, he was able to determine that the person who had signed the Contract on behalf of 8-Plus, i.e., Johnny, was one of the members of 8-Plus. Kamal noted that he never spoke to Johnny or any other members of 8-Plus.

---

[2] The trial court admitted into evidence a copy of the Contract signed by Kamal on behalf of Invesco and by Johnny on behalf of 8-Plus. The Contract listed Kamal's title at Invesco as "LLC Member" and Johnny's title at 8-Plus as "LLC Member."

[3] The trial court admitted into evidence a copy of the Certificate of Formation for 8-Plus, which stated: "The [LLC] will not have managers. The company will be governed by its members, and the name and address of each initial member are set forth below." Kamal testified that this section of the Certificate of Formation was important to him because it "inform[ed] the public . . . that th[e] company [was] run by the members, and then those members [were] enumerated." And Kamal knew that he could rely on that information.

5

Kamal signed the Contract on behalf of Invesco in January 2015, and Johnny signed the Contract on behalf of 8-Plus as "Johnny Carroll, LLC member." (Internal quotations omitted.) Kamal believed that Johnny had authority to sign the Contract because he was a member of 8-Plus and he signed the Contract which "itself sa[id] only authorized persons [were] intended to sign." Additionally, Kamal noted that there were no other "signature blocks" on the Contract for any other members of 8-Plus. And once Kamal and Johnny had signed the Contract, Kamal believed that "it was fully executed and signed" and that 8-Plus and Invesco "had a deal" and "a contract." According to Kamal, Invesco and 8-Plus had a valid enforceable agreement once the Contract had been signed by both parties.

While viewing the Contract during his testimony, Kamal explained that the document was titled, "Commercial Contract Improved Property." The Contract listed 8-Plus as the seller of the Property and Invesco as the buyer, and it gave the address for the Property. The sales price was listed as $62,500, and the Contract indicated that Invesco would pay cash. At the bottom of each page were Kamal's initials and Johnny's initials, which were dated January 19, 2015. Kamal noted that he initialed each page of the Contract to indicate that he had reviewed it and because the Contract required him to do so. By initialing the pages, Kamal agreed to the terms set forth on the pages.

Kamal further explained that the Contract required Invesco to pay earnest money—"money that[] [a buyer] deposit[s] . . . typically to show the seller that the buyer is serious about the transaction." Invesco paid the required earnest money to a title company, First American Title Company,[4] which "held [it] in trust," but 8-Plus was to receive the earnest money at the end of the transaction as part of the purchase price for the Property.[5] Kamal also explained that the Contract required Invesco to pay the cost of a survey of the Property, which was about $1,500. Invesco paid for the survey, which was then conducted. When the sale was closed, Invesco was then supposed to be reimbursed by 8-Plus for the cost of the survey.

As to closing, the Contract listed the closing date as March 31, 2015, and according to Kamal, it provided that "[i]f either [p]arty fail[ed] to close by the closing date, the non-defaulting party [could] exercise the remedies in [section] 15" of the Contract. (Internal quotations omitted.) Kamal noted that Invesco was prepared to close the sale on March 31, 2015. As to section 15 of the Contract, Kamal stated that it provided: "[I]f [8-Plus] fail[ed] to comply with th[e] [C]ontract, [8-Plus was] in default and [Invesco] may . . . [e]nforce specific performance or seek any other relief as may be provided by law or both." (Internal quotations omitted.)

---

[4]    Kamal noted that under the Contract, First American Title Company was the company that was to facilitate the closing of the sale of the Property.

[5]    According to Kamal, an "Escrow Receipt" section of the Contract was completed, which verified that Invesco had "paid the earnest money." (Internal quotations omitted).

Kamal stated that Invesco was seeking specific performance of the Contract because 8-Plus had "backed out of the deal"; Invesco was not seeking monetary relief. And under the terms of the Contract, Invesco could not recover attorney's fees from 8-Plus, even if it prevailed on its breach-of-contract claim.

Kamal also explained that the Contract provided that it was "binding on the parties, their heirs, executors, representatives, successors, and permitted assigns" and it was "to be construed in accordance with the laws of the State of Texas." (Internal quotations omitted.) Further, the Contract stated that it "contain[ed] the entire agreement of the parties and [could] not be changed except in writing." (Internal quotations omitted.) At the time Kamal signed the Contract in January 2015, he believed that it was "the entire agreement" between 8-Plus and Invesco.

Kamal further testified noted that later, in February 2015, the parties executed a "second version" of the Contract.[6] The second version of the Contract used "the same form" as the initial Contract, and it was also titled "Commercial Contract Improved Property." Instead of Kamal's initials on the bottom of every page though,

---

[6] Kamal explained that 8-Plus contacted Invesco and was concerned because the Property "used to be a gas station" and had been "entirely neglected." 8-Plus was worried that "there would be underground storage tanks on th[e] [P]roperty," and if "there was some contamination," that Invesco "could pursue [it]." Invesco planned to use the Property as a parking lot, and because 8-Plus had been "reasonable to deal with" up to that point, Invesco agreed to amend the Contract. The trial court admitted into evidence a copy of the second version of the Contract, which was signed by Johnny as an "LLC Member" for 8-Plus.

the second version of the Contract had the initials "N.A." for Nader Abdallah, another member of Invesco. According to Kamal, Abdallah had the authority to sign the second version of the Contract on behalf of Invesco. Johnny's initials also appeared on the second version of the Contract, with the date February 11, 2015.

Additionally, Kamal noted that the section that was amended in the second version of the Contract was section 7, titled "Property Condition." (Internal quotations omitted.) At 8-Plus's request, section 7 provided: "[Invesco] accepts [the] [P]roperty as is, where is, and conveyed as is with all faults. [8-Plus] has no knowledge of any faults on [the] [P]roperty subject to [the] [C]ontract herein." (Internal quotations omitted.) Essentially, the parties took the initial version of the Contract and "added th[e] as-is clause regarding the underground storage tanks" and then signed the second version of the Contract. Kamal and Johnny both signed the second version of the Contract on behalf of Invesco and 8-Plus, respectively. Under Johnny's signature was the title "LLC Member" of 8-Plus. There were no signature blocks for any of the other members of 8-Plus. Kamal believed that Johnny was authorized to sign the second version of the Contract, and he believed that there was a valid enforceable agreement between the parties once the Contract was signed.

Kamal further testified that closing of the sale was originally scheduled for March 31, 2015 at the offices of First American Title Company. After the Contract was signed and before the closing date, Invesco paid the required earnest money.

9

Kamal did not attend the closing on March 31, 2015, but Abdallah attended the closing on behalf of Invesco. No one from 8-Plus showed up. A second closing was then scheduled for July 2, 2015, and Invesco wired the funds to purchase the Property on July 2, 2015. Abdallah attended that closing as well on behalf of Invesco, but again no one from 8-Plus showed up. Kamal noted that at the time of trial Invesco still had the money to buy the Property, and Invesco still wanted to complete the transaction.

Johnny testified that he had seven siblings: James, Lois, Milton, Glory, Bobbie, Glenda, and Sharon. Johnny and his siblings formed 8-Plus in 2014 after inheriting some property from their father, including the Property. 8-Plus was an LLC that "maintain[ed] properties" and collected rent. According to Johnny, he and his siblings "ma[d]e decisions [to sell a property] by getting [all] eight siblings to sign, to agree." It took "all eight" siblings to "agree to transfer property." The siblings came to that arrangement at the time the LLC was formed, but they did not put it in writing. Johnny also stated that he told his brother James that "it w[ould] take all eight to . . . make [an] agreement," and James responded, "Okay. Yeah." (Internal quotations omitted.) However, he also testified that he did not speak to

James directly at the time 8-Plus was formed about needing all eight siblings to agree before the transfer of property. He just "assumed [they all] had to agree."[7]

Johnny further testified that before 2015, he had never negotiated the sale of a property that was owned by 8-Plus. However, he had forty years of experience negotiating contracts. Related to 8-Plus, his job was to "maintain the property, [do] the lawn cutting, and any maintenance required for the rental properties." Glory maintained "the books" for 8-Plus.

In January 2015, Johnny called Abdallah about buying the Property.[8] In their initial telephone conversation, Abdallah indicated that he wanted to purchase the Property, and Johnny told him, "Okay. Make an offer." (Internal quotations omitted.) According to Johnny, he told Abdallah that he was "only one member of the LLC" and they "need[ed] all eight to sign anything, any documents." (Internal quotations omitted.) Abdallah then sent Johnny "an initial offer" of $50,000 for the Property, but Johnny sent it back and told Abdallah that "it wasn't enough." Abdallah then sent another offer, which Johnny felt "still wasn't enough." Finally, Abdallah sent him an offer of $62,500 for the Property, and Johnny told Abdallah,

---

[7]     The trial court admitted into evidence a copy of a General Warranty Deed dated February 28, 2015. Johnny testified that the document evidenced "a conveyance of [a] property from 8-Plus to" Johnny's mother. The General Warranty Deed was only signed by Glory, and according to Johnny, that particular transaction did not need to be signed by all the siblings to be effective. However, Johnny and his siblings verbally agreed to convey that property to their mother.

[8]     According to Johnny, he called Abdallah three or four times related to the Property.

11

"I'll take the offer to my siblings and we'll look at it." (Internal quotations omitted.) Johnny stated that he then spoke to each of his siblings individually about selling the Property.

As to the Contract, Johnny explained that he signed the Contract on behalf of 8-Plus, and he confirmed that his initials appeared at the bottom of each page of the Contract along with the date January 19, 2015. Johnny also confirmed that he signed the Contract with his title listed as "LLC member." But, according to Johnny, he told Abdallah verbally that they "need[ed] another line item for the seller for [his] . . . seven siblings." And Abdallah responded, "It doesn't matter now. Just agree to this and . . . you can get that signed at closing." (Internal quotations omitted.) Johnny then thought to himself, "Oh, well. We'll do it at closing." (Internal quotations omitted.) In Johnny's mind, the Contract was just "a document to get a price agreed to, and nothing was binding." Johnny noted that he did not write anything in the Contract stating that his siblings "ha[d] to agree" to the Contract in addition to himself.

Johnny further testified that after the Contract was signed in January 2015, he asked Invesco "to change th[e] document to add [an] as-is condition" to section 7. Johnny then initialed that section of the second version of the Contract while meeting with Abdallah at Abdallah's office. Johnny did not add any notations on the second version of the Contract to "indicate that all eight members of 8-Plus . . . would need

12

to agree" to the sale of the Property, but he verbally told Abdallah to do so. Johnny initialed every page of the second version of the Contract and signed the signature page of the second version of the Contract.

Glory Churchwell testified that she had seven siblings: James, Johnny, Lois, Milton, Bobbie, Glenda, and Sharon. 8-Plus was formed in 2014, and she oversaw the "paying [of] the taxes and insurance and the maintenance of the real estate propert[ies]." Glory and her siblings were the members of 8-Plus, but there was no "written company agreement governing 8-Plus." Glory did not ask her siblings' permission before writing checks on behalf of 8-Plus. Yet, according to Glory, when 8-Plus was formed, the siblings agreed orally that they "would all need to agree to convey a property." When 8-Plus conveyed a certain piece of property to the siblings' mother, the siblings orally agreed to do so. 8-Plus never had meetings of the members.

As to the Property, Glory explained that she spoke to Abdallah about his interest in the Property, and she told him that she would let her brother know that he had called. She did not tell Abdallah that Johnny had the "authority to decide whether to sell the [P]roperty." Glory also testified that she and her siblings never voted to sell the Property and never agreed to sell the Property to Invesco. Glory did not know that Johnny had signed the Contract or the second version of the Contract. Johnny did ask Glory if she was interested in selling the Property, and she

13

was not. According to Glory, 8-Plus had never transferred a piece of property to someone other than a family member.

Milton Carroll testified that he was one of the members of 8-Plus. 8-Plus was formed "to provide protection for the siblings . . . who were . . . going to inherit [certain] properties that [their] dad had accumulated over a lot of years." 8-Plus made decisions to transfer properties in "a very, very informal way." They would gather at their mother's house; there were no meetings. "[A]nyone c[ould] talk to anyone about everything, but . . . all of [them] ha[d] to agree to do anything about disposing of any properties." However, there was no written agreement in place, and there was not some sort of resolution. Milton could not recall whether he had ever signed a document along with his seven siblings to transfer a piece of property.

As to the Property, Milton stated that Johnny told him that "a gentleman wanted to buy the [P]roperty . . . . He had talked to him about it. He had made an offer for it and he's trying to size up whether the rest of the siblings would like to sell it." Milton told Johnny that he was "not selling" the Property. (Internal quotations omitted.) He did not tell Johnny that he agreed to sell the Property. But five of Milton's siblings were interested in selling the Property.

The jury found in favor of Invesco on its breach-of-contract claim. Specifically, the jury found that 8-Plus had "agree[d] to sell" the Property to Invesco; 8-Plus "fail[ed] to comply with the agreement"; 8-Plus's "failure to comply with the

agreement" was not excused; and Invesco was "ready, willing, and able[] to perform its obligations under the agreement at all material times."

Invesco then filed a motion for judgment on the verdict and requested that the trial court award it specific performance pursuant to the Contract. The trial court entered judgment based on the jury's findings and awarded Invesco "specific performance of the Contract from and against 8-Plus."

## Actual or Apparent Authority

In its first issue, 8-Plus argues that the trial court erred in rendering judgment in favor of Invesco on its breach-of-contract claim because there was "no evidence that Johnny . . . had actual or apparent authority to bind 8-Plus."[9]

When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial—here, the jury's finding that Johnny had authority to bind 8-Plus to the Contract—it must demonstrate that no

---

[9] In its first issue, 8-Plus challenges the legal sufficiency of the evidence supporting the jury's finding that Johnny had actual or apparent authority to bind 8-Plus to the Contract. In its second issue, 8-Plus asserts that the evidence is factually insufficient to support the jury's finding that Johnny had the authority to bind 8-Plus to the Contract. The entirety of 8-Plus's factual-sufficiency argument is comprised of two sentences: "For the exact same reasons as in the no-evidence, legal sufficiency points . . . , there is likewise factually-insufficient evidence supporting the finding that 8-Plus granted Johnny . . . actual or apparent authority to sell the Property to Invesco. As a result, the jury's verdict as to Johnny['s] . . . actual or apparent authority is clearly wrong and manifestly unjust." We conclude that 8-Plus's second issue—its factually-sufficiency complaint—is waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i); *Trimcos, LLC v. Compass Bank*, 649 S.W.3d 907, 921 (Tex. App.—Houston [1st Dist.] 2022, no pet.) ("A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal.").

evidence supports the finding.  *See Exxon Corp. v. Emerald Oil & Gas, Co.*, 348 S.W.3d 194, 215 (Tex. 2011).  We will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact.  *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

In a legal-sufficiency review, we consider the evidence in a light most favorable to the jury's finding, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.  *Id.* at 827; *see also Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (in reviewing "no evidence" point, court views evidence in light that tends to support finding of disputed fact and disregards all evidence and inferences to contrary); *Republic Petroleum, LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).  The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *See City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

When, as here, the parties did not object at trial to the substance of the law set forth in the jury charge, we review the sufficiency of the evidence in light of the legal standards contained in the unobjected-to charge.  *See Osterberg v. Peca*, 12

16

S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."); *Badall v. Durgapersad*, 454 S.W.3d 626, 634 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Question No. 1 of the trial court's charge asked the jury: "Did 8-Plus . . . agree to sell the [Property] to Invesco . . . ?" The charge then instructed the jury as follows:

> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

> A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

> Authority for another to act for a party must arise from the party's agreement that the other act on behalf of and for the benefit of the party. If a party so authorized another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

> Each governing person of a[n] [LLC] and each officer of a[n] [LLC] vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business.

> An act committed by an agent of a[n] [LLC] for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company binds the company unless:

>> (1) the agent does not have actual authority for the company; and

17

(2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.

An act in the ordinary course of business is the normal routine in managing a trade or business, a regular course of procedure, or the habitual or mechanical performance of an established procedure.

An act committed by an agent of a[n] [LLC] that is not apparently for carrying out the ordinary course of business of the company binds the company only if the act is authorized in accordance with Texas law.

Unless the company agreement provides otherwise, an action of a[n] [LLC] not apparently for carrying out the ordinary course of business of the company must be approved by the affirmative vote of the majority of the company's governing persons present at a meeting during which the majority of members are present and for which all members have received notice.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority, or (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person acting with diligence and discretion to ascertain the agent's authority and rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

Based on the instructions in the trial court's charge, the jury could have found that Johnny's actions bound 8-Plus to the Contract because Texas Business Organizations Code section 101.254 applied, Johnny had actual authority to bind 8-Plus, or Johnny had apparent authority to bind 8-Plus.

Texas Business Organizations Code section 101.254 explains the authority of agents of an LLC. *See 8-Plus Props., LLC v. Invesco Comm'l Enters., LLC*, No. 01-17-00657-CV, 2019 WL 3819515, at *7 (Tex. App.—Houston [1st Dist.] Aug.

18

15, 2019, no pet.) (mem. op.). As quoted in the trial court's charge to the jury, section 101.254 provides:

> (a) Except as provided by this title and Title 1, each governing person of a[n] [LLC] and each officer of a[n] [LLC] vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business.
>
> (b) An act committed by an agent of a[n] [LLC] described by [s]ubsection (a) for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company unless:
>
> > (1) the agent does not have actual authority to act for the company; and
> >
> > (2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.
>
> (c) An act committed by an agent of a[n] [LLC] described by [s]ubsection (a) that is not apparently for carrying out the ordinary course of business of the company binds the company only if the act is authorized in accordance with this title.

TEX. BUS. ORGS. CODE ANN. § 101.254. A "[g]overning person" is defined as "a person serving as part of the governing authority of an entity." *Id.* § 1.002(37). "[G]overning authority" with respect to an LLC is defined as: "(1) the managers of the company, if the company's certificate of formation states that the company has managers; or (2) the members of the company, if the company's certificate of formation does not state that the company has managers." *Id.* § 101.251(b).

It is undisputed that Johnny was a "governing person" of 8-Plus, an LLC. Thus, he was an "agent of [8-Plus] for purposes of carrying out [8-Plus's] business." *Id.* § 101.254(a); *see also 8-Plus Props.*, 2019 WL 3819515, at *8. Here, however, 8-Plus challenges whether Johnny was "apparently carrying out the ordinary course of business of [8-Plus]," whether Johnny lacked "actual authority" to "act for [8-Plus]," and whether Invesco knew of Johnny's lack of authority. TEX. BUS. ORGS. CODE ANN. § 101.254(b).

Initially, 8-Plus asserts that "there is no evidence to support the jury's implicit finding that 8-Plus sells [real] property as part of its ordinary course of business." The trial court's charge to the jury defined "ordinary course of business" as follows: "An act in the ordinary course of business is the normal routine in managing a trade or business, a regular course of procedure, or the habitual or mechanical performance of an established procedure." The trial court's charge also "includ[ed]" in its definition of "apparently carrying out the ordinary course of business of [a] company," the act of "execut[ing] . . . an instrument, document, mortgage, or conveyance in the name of the company." *See id.*

Johnny's actions in executing the Contract as an "LLC, member" of 8-Plus fall within the jury charge's definition of "apparently carrying out the ordinary

20

course of business" of 8-Plus.[10] *See Osterberg*, 12 S.W.3d at 55 ("[I]t is the court's charge . . . that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). 8-Plus, in their briefing, focuses their argument on what the actual purpose of its business was—asserting that 8-Plus had "never sold, or marketed or advertised to sell, real property." (Emphasis omitted.) But in doing so, 8-Plus ignores the language of the trial court's charge. Importantly, the jury charge asked the jury whether Johnny's actions were "for the purpose of *apparently* carrying out the ordinary course of business of [8-Plus]" and then defined "apparently carrying out the ordinary course of business" to "includ[e]" the "execution of an instrument, document, mortgage, or conveyance in the name of [8-Plus]." (Emphasis added.) Thus, we find 8-Plus's argument unavailing.

8-Plus next argues that "[e]ven if selling real property was within the scope of 8-Plus's ordinary course of business," Johnny lacked actual authority to sell the Property and "Invesco knew [that] Johnny lacked authority to sell" the Property. *See* TEX. BUS. ORGS. CODE ANN. § 101.254(b) (explaining act of LLC's agent does not bind company if agent did not have actual authority to act for company and person with whom agent is dealing has knowledge of agent's lack of actual authority). For purposes of this opinion, we will presume, without deciding, that Johnny lacked

---

[10] The trial court admitted into evidence a copy of the Contract and the second version of the Contract both of which were signed by Johnny on behalf of 8-Plus. Johnny's title on both documents is listed as "LLC member" of 8-Plus.

21

actual authority to sell the Property and focus on 8-Plus's argument that the evidence was legally insufficient to support the jury's implicit finding that "Invesco [did not know that] Johnny lacked authority to sell" the Property. *See* TEX. R. APP. P. 47.1.

At trial, Kamal, a member of Invesco, testified that he received the Contract for the sale of the Property from 8-Plus in January 2015. In the course of doing his due diligence related to the Contract, Kamal learned that 8-Plus was a "member-managed" LLC, and he learned the names of the eight members of 8-Plus.[11] Invesco was also a member-managed LLC, so Kamal was familiar with that form of management. Kamal noted that after reviewing the Contract, he was able to determine that the person who had signed the Contract on behalf of 8-Plus, i.e., Johnny, was one of the members of 8-Plus.

As to the Contract itself, Kamal explained that when he received it, it was signed by Johnny on behalf of 8-Plus and listed Johnny's title as "LLC member." (Internal quotations omitted.) Johnny had also initialed each page of the Contract and struck through certain portions of the Contract that he did not want applied to

---

[11] The trial court admitted into evidence a copy of the Certificate of Formation for 8-Plus, which stated: "The [LLC] will not have managers. The company will be governed by its members, and the name and address of each initial member are set forth below." Kamal testified that this section of the Certificate of Formation was important to him because it "inform[ed] the public . . . that th[e] company [was] run by the members, and then those members [were] enumerated." And Kamal knew that he could rely on that information.

22

the Invesco and 8-Plus transaction.[12]  Kamal believed that Johnny had authority to sign the Contract because he was a member of 8-Plus and he signed the Contract which "itself sa[id] only authorized persons [were] intended to sign."  Additionally, Kamal noted that there were no other "signature blocks" on the Contract for any other members of 8-Plus.  In Kamal's mind, once he and Johnny had signed the Contract, "it was fully executed and signed," and he believed that 8-Plus and Invesco "had a deal" and "a contract."[13]

In contrast, Johnny testified that he spoke to Abdallah, Kamal's partner, about buying the Property in January 2015.  During their initial telephone conversation, Abdallah indicated that he wanted to purchase the Property, and Johnny told him, "Okay.  Make an offer."  (Internal quotations omitted.)  According to Johnny, he told Abdallah that he was "only one member of the LLC" and they "need[ed] all eight to sign anything, any documents."  (Internal quotations omitted.)  Further, Johnny testified that when Abdallah sent Johnny an offer of $62,500 for the

---

[12]     Kamal noted that he also initialed each page of the Contract to indicate that he had reviewed it and that he agreed to the terms set forth on the pages.

[13]     Kamal also testified that the second version of the Contract included Johnny's initials on each page and the date.  Johnny signed the second version of the Contract on behalf of 8-Plus, which included his title "LLC Member."  There were no signature blocks for any of the other members of 8-Plus, and Kamal believed that Johnny had the authorization to sign the second version of the Contract.  In Kamal's mind, there was a valid enforceable agreement between the parties once the Contract was signed.

23

Property, Johnny told Abdallah, "I'll take the offer to my siblings and we'll look at it." (Internal quotations omitted.)

Johnny did acknowledge in his testimony that he signed the Contract on behalf of 8-Plus and it was his initials that appeared at the bottom of each page of the Contract along with the date January 19, 2015. And Johnny confirmed that he signed the Contract with his title listed as "LLC member." Further, Johnny noted that he did not write anything in the Contract stating that his siblings "ha[d] to agree" to the Contract in addition to himself.

However, according to Johnny, he told Abdallah verbally that they "need[ed] another line item for the seller for [his] . . . seven siblings." And Abdallah responded, "It doesn't matter now. Just agree to this and . . . you can get that signed at closing." (Internal quotations omitted.) Johnny then thought to himself, "Oh, well. We'll do it at closing." (Internal quotations omitted.) In Johnny's mind, the Contract was just "a document to get a price agreed to, and nothing was binding."

As to the second version of the Contract, Johnny testified that he did not add any notations on the second version to "indicate that all eight members of 8-Plus . . . would need to agree" to the sale of the Property, but he verbally told Abdallah to do so. Johnny initialed every page of the second version of the Contract and signed the signature page of the second version of the Contract.

Here, the jury heard conflicting testimony and evidence as to whether "Invesco knew [that] Johnny lacked authority to sell" the Property. *See* TEX. BUS. ORGS. CODE ANN. § 101.254(b)(2). The jury, as the fact finder, was the sole judge of the witnesses' credibility and the weight to give their testimony. *Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018). It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict. *Id.* We defer to the jury's resolution of conflicting evidence.

Based on the foregoing, we cannot conclude that no evidence supported the jury's implicit findings that Johnny was "apparently carrying out the ordinary course of business" of 8-Plus in signing the Contract and that Invesco did not know that Johnny lacked actual authority to sell the Property. Accordingly, we hold that the evidence was legally sufficient to support the jury's finding that Johnny had authority to bind 8-Plus to the Contract. *See* TEX. BUS. & ORGS. CODE ANN. § 101.254.

We overrule 8-Plus's first issue.

### Specific Performance

In its third issue, 8-Plus argues that the trial court erred in awarding Invesco specific performance of the Contract because "there [was] no evidence that Invesco properly tendered performance under the . . . [C]ontract."

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). A party suing for breach of contract involving the sale of real estate must elect to sue for either money damages or specific performance. *See World Food Imports, Inc. v. HHO United Grp., Inc.*, No. 05-22-01160-CV, 2024 WL 4553211, at *7 (Tex. App.—Dallas Oct. 23, 2024, no pet.) (mem. op.) The equitable remedy of specific performance operates to compel a party violating a duty under a valid contract to comply with its obligations. *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at *13 (Tex. App.—Dallas Aug. 28, 2017, pet. denied) (mem. op.). Specific performance may be awarded at the trial court's discretion. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth 2008, pet. denied).

It is a general rule of equity jurisprudence in Texas that a party must show that it has complied with its obligations under the contract to be entitled to specific performance. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008). Thus, a party seeking specific performance must prove both that it tendered performance and that it was ready, willing, and able to perform. *See id.* at 593–94, 599–600; *Lyons v. Ortego*, No. 01-17-00092-CV, 2018 WL 4014218, at *5 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, pet. denied) (mem. op.). "These two requirements are not the same thing." *DiGiuseppe*, 269 S.W.3d at 599.

26

Here, the jury found that Invesco was "ready, willing, and able[] to perform its obligations under the [Contract] at all material times." And 8-Plus does not challenge the jury's finding on appeal. Instead, 8-Plus argues that the trial court erred in awarding Invesco specific performance of the Contract because Invesco did not establish that it had "tendered performance"—a finding that the trial court made in its final judgment.[14]

8-Plus primarily relies on *Wilson v. Klein*, 715 S.W.2d 814 (Tex. App.—Austin 1986, writ ref'd n.r.e.) to support its argument. Specifically, 8-Plus argues that because the Contract contained a "time is of the essence" provision, Invesco was required to actually tender the purchase price for the Property before it was entitled to seek specific performance in the underlying suit.

In *Wilson*, the plaintiff, Robert Wilson, contracted to purchase certain tracts of land from the defendant, Allan Klein. *See* 715 S.W.2d at 816. A dispute then arose between Wilson and Klein as to the meaning of the part of their contract that provided for the calculation of the purchase price, with Klein asserting that "Wilson was obligated to pay for [a certain] 6.60 acres at the rate of $18,000 per acre." *Id.* at 818. Wilson "never made actual tender of an amount that included [that] payment," but filed suit for specific performance of the contract, "offer[ing] in his pleading to

_____

[14] The trial court, in its final judgment, awarded Invesco specific performance of the Contract after finding that Invesco had "tendered performance" of the Contract.

27

pay a price that included [that additional] payment . . . if it be judicially determined that such [was] the purchase price mandated by his contract with Klein." *Id.* at 819 (emphasis omitted). Notably, Wilson and Klein's contract provided that "time was 'of the essence' of the parties' respective contract rights and obligations." *Id.*

After the trial court ordered that Wilson take nothing in his suit for specific performance of the contract, Wilson appealed. *Id.* The court of appeals concluded that Wilson and Klein's contract "called for Wilson to pay for the 6.60 acres," and noted that Wilson had "never actually tendered the correct purchase price" for the tracts of land before filing suit. *Id.* at 821. The court then explained that "[a]ctual [t]ender of the [c]orrect [p]urchase [p]rice [w]as [r]equired of Wilson as a [p]rerequisite for [obtaining] [s]pecific [p]erformance" because the "contract in question provided expressly and unequivocally that time was 'of the essence.'" *Id.* In doing so, the court noted that "[g]enerally speaking, it [was] a prerequisite to the equitable remedy of specific performance that the buyer of land shall have made an actual tender of the purchase price." *Id.* at 822. Further, "[t]here [was] a more particular rule that applie[d] where the parties ha[d] stipulated in their contract . . . that time [was] 'of the essence' of their contract rights and obligations." *Id.* (emphasis omitted). "In such cases, the buyer [was required to] make an actual tender of the [purchase] price and demand the deed within the time allowed by the contract." *Id.* (internal quotations and emphasis omitted).

28

In *Wilson*, the court of appeals, thus, held that Wilson was not entitled to specific performance of the contract because he never made actual tender of the purchase price to Klein within the time permitted by the contract. *Id.* at 823. And allowing specific performance could allow the parties' contract to "continue . . . several years past the time required for the parties' performance, notwithstanding that they [had] stipulated that timeliness was an essential aspect of any obligation, right, or estate created in the contract." *Id.* (emphasis omitted).

Here, the Contract stated that 8-Plus "agree[d] to sell and convey" the Property to Invesco and Invesco "agree[d] to buy the Property" from 8-Plus for $62,500. Invesco was to pay $62,500 cash "[a]t or before closing." "The closing of the sale [would] be on or before March 31, 2015," and "[a]t closing," Invesco was required to "pay the sales price in good funds acceptable to the escrow agent," "deliver evidence that the person executing th[e] [C]ontract [was] legally capable and authorized to bind" Invesco, and "execute and deliver any notices, statements, certificates, or other documents required by th[e] [C]ontract or law necessary to close the sale." Additionally, the Contract provided that "[t]ime [was] of the essence in th[e] [C]ontract" and "[t]he parties require[d] strict compliance with the times for performance." And it stated that the Contract was "binding on the parties, their heirs, executors, representatives, successors, and permitted assigns," and the Contract

"contain[ed] the entire agreement of the parties and may not be changed except in writing."[15]

Kamal testified that Invesco wired the funds to purchase the Property, but that it did not do so until July 2, 2015. As specified, in the Contract, the closing date for the sale was designated as March 31, 2015. Although Invesco, in its briefing, asserts that the closing date was later "changed" to July 2, 2015 "to accommodate 8-Plus" and that the closing date was "moved by agreement," such evidence is not contained in the record. Instead, the Contract, a copy of which was admitted into evidence, stated that "[t]he closing of the sale" of the Property would "be on or before March 31, 2015," and "[a]t closing," Invesco was required to "pay the sales price in good funds acceptable to the escrow agent." The Contract also specified that "[t]ime [was] of the essence in th[e] [C]ontract" and "[t]he parties require[d] strict compliance with the times for performance." Any changes to the Contract were required to be in writing. Accordingly, to be entitled to specific performance in the instant case, Invesco was required to show that it actually tendered the purchase price of the Property by the closing date—March 31, 2015—set forth in the Contract. *See Wilson*, 715 S.W.2d at 822–23; *see also Lyons*, 2018 WL 4014218, at *6 ("When time is of the essence in a contract for the sale of real estate, 'the buyer must make

---

15    The second version of the Contract, a copy of which was admitted into evidence at trial, contained these same provisions.

an actual tender of the price and demand of the deed *within the time allowed by the contract*.'" (quoting *Wilson*, 715 S.W.2d at 822)); *Shafer v. Gulliver*, No. 14-09-00646-CV, 2010 WL 4545164, at \*5 (Tex. App.—Houston [14th Dist.] Nov. 12, 2010, no pet.) (mem. op.). And, here, it did not do so.

We note that Invesco also argues in its briefing that if its wiring of the purchase price after the March 31, 2015 closing date was not sufficient to show that it had "tender[ed] performance," then its actual tender of the purchase price by March 31, 2015 was unnecessary because tendering performance would have been a "useless act" and because 8-Plus prevented its performance by repudiating the Contract. But Invesco did not make these arguments in the trial court or request any questions for the jury on such issues. In fact, in its motion for judgment on the verdict and for specific performance, Invesco only argued to the trial court that it was entitled to specific performance because it had complied with its obligations under the Contract by "wir[ing] the full purchase price of the [P]roperty to First American Title [Company]" on July 2, 2015. *See Stewart & Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337, 341 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("A party should not be able to take one position before the trial court and the opposite position on appeal."). Thus, these arguments by Invesco on appeal are unavailing.

Because Invesco did not establish that it had tendered the purchase price of the Property by the closing date set forth in the Contract, we hold that it was not entitled to specific performance of the Contract and the trial court erred in awarding it such. *See DiGiuseppe*, 269 S.W.3d at 593–94, 599–600; *Lyons*, 2018 WL 4014218, at *5–7.

We sustain 8-Plus's third issue.

## Conclusion

We reverse the judgment of the trial court awarding Invesco specific performance and render judgment that Invesco take nothing on its request for specific performance.

Julie Countiss
Justice

Panel consists of Justices Goodman, Landau, and Countiss.